United States District Court
Southern District of Texas
FILED

AUG 30 2010

David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LISA BEAN-KEMP, individually and as guardian of Mecole Roques, TIFFANY SLOAN, as guardian of Mecole Roques' minor child J.S., TAMIKA SEWELL, individually and as guardian of Dexter Sewell, and TIFFANY BABIN, as guardian of Dexter Sewell's minor child D.S.,

Plaintiffs,

v.

CITY OF HOUSTON, HARRIS COUNTY, CHARLES A. McCLELLAND, JR., in his official capacity, HAROLD HURTT, BILL BAILEY, and GARY FREEMAN, in their official and individual capacities, and R.T. HATCHER, W.G. MUNOZ, A. ULLOA, J.M. OLIVAREZ, OFFICER HIGHTOWER, D.A. RIGGS, JASON CURRY, and TROY CRAIG, in their individual capacities

Defendants.

§ § § § § § § § § § § § § § § § § § § § § §

CIVIL ACTION NO.

H-10-3111

**JURY TRIAL DEMANDED**

**PLAINTIFFS' ORIGINAL COMPLAINT**

Plaintiffs, as guardians of Mecole Roques and his minor child, and of Dexter Sewell and his minor child, bring this civil action for damages and equitable relief against the City of Houston, Harris County, several Houston Police Department (HPD) employees, and several Harris County Constable employees. Plaintiffs allege that Defendants created a dangerous nighttime roadblock on Interstate 10 in Houston, forcibly using privately owned and occupied vehicles, including the car Mr. Roques and Mr. Sewell occupied, in such a way that a vehicle the police were chasing crashed into their car, causing them serious, permanent injury and disability. Defendants, thus, violated Mr. Roques and Mr. Sewell's Fourth and Fourteenth Amendment and other legal rights, under color of law. Plaintiffs will show:

STATEMENT OF THE CASE

1. Defendants acted in concert to create a deadly roadblock made with privately owned and occupied vehicles. Defendants then directed and pursued an emergency vehicle, traveling at speeds over 80 miles per hour, into the barricade, causing Mecole Roques and Dexter Sewell severe and permanent brain damage and other bodily injuries. Defendants unlawfully seized Mr. Roques and Mr. Sewell's vehicle and used their vehicle and their bodies as a human shield.

2. Defendants R.T. Hatcher, W.G. Munoz, A. Ulloa, J.M. Olivarez, Officer Hightower, D.A. Riggs, Troy Craig, and Jason Curry, acting in concert, herded a fleeing vehicle towards a roadblock made with privately owned and occupied vehicles, including Plaintiffs', which caused Plaintiffs permanent, serious bodily harm. This conduct shocks the conscience. Plaintiffs sue these Defendants in their individual capacities for actual and punitive damages, pursuant to 42 U.S.C. § 1983.

3. Defendants Harold Hurtt, Bill Bailey, and Gary Freeman were responsible for the conduct of these law enforcement officers. Hurtt, Bailey, and Freeman were also responsible for supervising, training, and disciplining those officers. Plaintiffs sue these Defendants in their official and individual capacities for actual and punitive damages, pursuant to 42 U.S.C. § 1983.

4. Plaintiffs sue the City of Houston, Harris County, Charles A. McClelland, Bailey, and Freeman to enjoin continued and unconstitutional use of privately owned and occupied vehicles in roadblocks, whether actual or effective use.

5. Plaintiffs sue all Defendants for declaratory relief, seeking a declaration that they violated Mr. Roques and Mr. Sewell's civil rights.

6. Plaintiffs sue the City and Harris County for violations of 42 U.S.C. § 1983 through official policies, customs, and practices.

JURISDICTION & VENUE

7. Plaintiffs plead jurisdiction under 28 U.S.C. §§ 1331 & 1343(a)(3)-(4). Plaintiffs bring federal claims under 42 U.S.C. § 1983, the Fourth, and the Fourteenth Amendments to the United States Constitution.

8. This Court has jurisdiction to provide declaratory and other relief pursuant to 28 U.S.C. §§ 2201(a) & 2202.

9. All relevant events took place within this judicial District and Division. All individual Defendants reside or work in Harris County, where the City of Houston is located. Thus, venue is proper under 28 U.S.C. § 1391(b).

PARTIES

10. Plaintiff Lisa Bean-Kemp is Mecole Roques' sister, court-appointed guardian, and next friend. After the collision permanently incapacitated Mr. Roques, Ms. Bean-Kemp assumed responsibility for his ongoing support. Ms. Bean-Kemp brings Mr. Roques' claims.

11. Plaintiff Tiffany Sloan is the biological mother, court-appointed guardian, and next friend of Mr. Roques' minor child and sole heir, J.S. J.S. is a regular passenger on Houston freeways. Since 2006, HPD has averaged 818 vehicular pursuits each year. Of those pursuits ending involuntarily, 44% have ended with some type of collision or vehicle losing control. Of those pursuits ending with a roadblock, 15% have involved a collision with innocent bystanders, and 25% of those ending with tire deflation devices have involved a collision with bystanders. Without injunctive relief, J.S. is reasonably likely to occupy a vehicle slowed or stopped by HPD, exposing J.S. to harm as a human barrier.

12. Plaintiff Tamika Sewell is Dexter Sewell's mother, court-appointed guardian, and next friend. After the collision permanently incapacitated Mr. Sewell, Ms. Sewell assumed responsibility for his ongoing support. Ms. Sewell brings Mr. Sewell's claims.

13. Plaintiff Tiffany Babin is the biological mother, court-appointed guardian, and next friend of Mr. Sewell's minor child and sole heir, D.S. D.S. is a regular passenger on Houston freeways. Since 2006, HPD has averaged 818 vehicular pursuits each year. Of those pursuits ending involuntarily, 44% have ended with some type of collision or vehicle losing control. Of those pursuits ending with a roadblock, 15% have involved a collision with innocent bystanders, and 25% of those ending with tire deflation devices have involved a collision with bystanders. Without injunctive relief, D.S. is reasonably likely to occupy a vehicle slowed or stopped by HPD, exposing D.S. to harm as a human barrier. Without injunctive relief, D.S. is reasonably likely to occupy a vehicle slowed or stopped by HPD, exposing D.S. to harm as a human barrier.

14. Defendant City of Houston operates and is responsible for HPD. The City may be served through its Mayor, the Honorable Annise D. Parker, at City Hall, 901 Bagby, Houston, Texas 77002.

15. Defendant Harris County operates and is responsible for the Constable offices. Harris County may be served through County Judge Ed Emmett, at 1001 Preston, Suite 911, Houston, Texas 77002.

16. Defendant Charles A. McClelland, Jr. is Chief of Police for the Houston Police Department. McClelland took office April 14, 2010. As Chief of Police, he is responsible for making and implementing HPD policy, including the HPD "Motor Vehicle Pursuits" policy. McClelland is final policymaker for HPD. McClelland, further, is responsible for all HPD operations, supervision, and training. Plaintiffs sue him in his official capacity for injunctive relief. He may be served at the Police Department, 1200 Travis, Houston, Texas 77002.

17. Defendant Harold Hurtt was Chief of Police for HPD from at least January 1, 2005 through December 1, 2009. As Chief of Police, he was responsible for making and

implementing HPD policy, including the HPD "Motor Vehicle Pursuits" policy. In addition, he had final responsibility for training, supervising, and disciplining his subordinates. During his tenure, he was final policymaker for HPD. Hurtt was Chief of Police on January 14, 2009, when his subordinates erected a roadblock using privately owned and occupied vehicles. Further, at all relevant times, he acted under color of law and as agent, servant, and employee of the City. As such, he was responsible for upholding the laws of the United States and Texas. Plaintiffs sue him in his official capacity for declaratory relief and individual capacity for damages. He may be served at 5407 Evergreen Valley Drive, Humble, Texas 77345.

18. Defendant Bill Bailey is Harris County Constable, Precinct 8. As Constable, he is responsible for making and implementing Precinct 8 policy, including its motor vehicle pursuit policy. Bailey is final policymaker for Precinct 8. He is responsible for all Precinct 8 operations and has final authority for training, supervision, and discipline. Further, at all relevant times, he acted under color of law and as agent, servant, and employee of Harris County. As such, he was responsible for upholding the laws of the United States and Texas. Plaintiffs sue him in his official capacity for declaratory and injunctive relief and individual capacity for damages. He may be served at Precinct 8, 16603 Buccaneer Lane, Houston, Texas 77062.

19. Defendant Gary Freeman is Harris County Constable, Precinct 2. As Constable, he is responsible for making and implementing Precinct 2 policy, including its motor vehicle pursuit policy. Freeman is final policymaker for Precinct 2. He is responsible for all Precinct 2 operations and has final authority for training, supervision, and discipline. Further, at all relevant times, he acted under color of law and as agent, servant, and employee of Harris County. As such, he was responsible for upholding the laws of the United States and Texas. Plaintiffs sue him in his official capacity for declaratory and injunctive relief and individual capacity for damages. He may be served at Precinct 2, 109 East Shaw, Pasadena, Texas 77506.

20. At all relevant times, R.T. Hatcher was a HPD sergeant, acting under color of law, and as agent, servant, and employee of the HPD. As such, he was responsible for upholding the laws of the United States and Texas. Plaintiffs sue him in his individual capacity for damages. He may be served at the Police Department headquarters, 1200 Travis, Houston, Texas 77002.

21. At all relevant times, A. Ulloa was a HPD officer, acting under color of law, and as agent, servant, and employee of the HPD. As such, he was responsible for upholding the laws of the United States and Texas. Plaintiffs sue him in his individual capacity for damages. He may be served at the Police Department headquarters, 1200 Travis, Houston, Texas 77002.

22. At all relevant times, Officer Hightower was a HPD officer, acting under color of law, and as agent, servant, and employee of the HPD. As such, he was responsible for upholding the laws of the United States and Texas. Plaintiffs sue him in his individual capacity for damages. He may be served at the Police Department headquarters, 1200 Travis, Houston, Texas 77002.

23. At all relevant times, J.M. Olivarez was a HPD officer, acting under color of law, and as agent, servant, and employee of the HPD. As such, he was responsible for upholding the laws of the United States and Texas. Plaintiffs sue him in his individual capacity for damages. He may be served at the Police Department headquarters, 1200 Travis, Houston, Texas 77002.

24. At all relevant times, W.G. Munoz was a HPD officer, acting under color of law, and as agent, servant, and employee of the HPD. As such, he was responsible for upholding the laws of the United States and Texas. Plaintiffs sue him in his individual capacity for damages. He may be served at the Police Department headquarters, 1200 Travis, Houston, Texas 77002.

25. At all relevant times, D.J. Riggs was a HPD officer, acting under color of law, and as agent, servant, and employee of the HPD. As such, he was responsible for upholding the laws

of the United States and Texas. Plaintiffs sue him in his individual capacity for damages. He may be served at the Police Department headquarters, 1200 Travis, Houston, Texas 77002.

26. At all relevant times, Jason Curry was a Harris County Deputy Constable, acting under color of law, and as agent, servant, and employee of Harris County. As such, he was responsible for upholding the laws of the United States and Texas. Plaintiffs sue him in his individual capacity for damages. He may be served at Precinct 8, 16603 Buccaneer Lane, Houston, Texas 77062.

27. At all relevant times, Troy Craig was a Harris County Deputy Constable, acting under color of law, and as agent, servant, and employee of Harris County. As such, he was responsible for upholding the laws of the United States and Texas. Plaintiffs sue him in his individual capacity for damages. He may be served at Precinct 2, 109 East Shaw, Pasadena, Texas 77506.

STATEMENT OF FACTS

28. On January 14, 2009, Harris County Precinct 7 Deputy Constable Gregory James responded to a service call on the South Sam Houston Toll Road (also "Beltway 8") between Telephone and Blackhawk Roads around 9:50 p.m. regarding a stalled vehicle. James had an altercation with the female driver of that vehicle, and she fled the scene in Mr. James' constable vehicle.

29. There were no weapons in James' car and the vehicle had a global positioning system to track its whereabouts.

30. James then contacted his dispatcher to request assistance and inform dispatch that the driver took his car. Precinct 7 notified neighboring agencies. Around 10:04 p.m., Precinct 2 ordered Deputy Constable Jason Curry to assist James. En route, Precinct 2 informed Curry that the driver had taken James' car. Around that same time, Curry spotted James' vehicle heading

eastbound on Beltway 8. Curry unsuccessfully attempted to stop the fleeing vehicle. Curry initiated pursuit, informed dispatch, and followed the driver approximately 15 miles around Beltway 8. Through conversations with other law enforcement agencies, Curry knew the concerted plan was to erect a roadblock using privately owned and occupied vehicles. Curry's responsibility was to herd the driver into the blockade. The driver exited onto I-10 headed westbound towards Houston. At that time, Precinct 8 Deputy Constable Troy Craig joined the pursuit and took over as the primary unit. Craig and Curry continued their pursuit, chasing the driver over an overpass and into the human roadblock which was created by HPD officers Hatcher and Munoz in the hope of funneling the driver through a single lane where "spike strips" were to be laid. Craig and Curry both knew the concerted plan was to erect a roadblock using privately owned and occupied vehicles. Their responsibility was to herd the driver into the blockade and ensure she did not escape. HPD, through Hatcher and Munoz, was responsible for creating the roadblock that consisted of innocent and unknowing citizens. Hatcher and Munoz' responsibility was to create the barricade to stop the oncoming driver.

31. HPD officers A. Ulloa, Hightower, and J.M. Olivarez joined the constables' chase around the time the driver entered I-10. These officers joined Craig and Curry's pursuit and were also responsible for herding the driver at high speeds towards the roadblock. Ulloa, Hightower, and Olivarez all knew the concerted plan was to erect a roadblock using privately owned and occupied vehicles. Their responsibility was to herd the driver into the blockade and ensure she did not escape.

32. Sergeant Hatcher learned about the pursuit around 10:15 p.m., while posted at the Northeast Station. Hatcher authorized Northeast Units to participate in the chase and decided to use a "spike strip" to terminate the chase. Hatcher knew that for the "spike strip" to work, he would need a roadblock that funneled the driver through a lane where strips would be laid.

Hatcher decided it was faster to use privately owned and occupied vehicles as a roadblock, rather than locating sufficient emergency vehicles or other roadblock equipment. The involved units told Hatcher that the driver was traveling westbound on I-10 in the "number 3" lane at approximately 80 miles per hour.

33. Munoz, a responding HPD officer, knew his single police car would not provide an effective blockade. After he arrived at the 7400 block of I-10, Munoz parked his patrol vehicle perpendicular to oncoming traffic and across the number three and four lanes.[1] Munoz parked his car in a manner to stop other westbound traffic between his patrol car and the driver being pursued at high speed; he used these innocent bystanders – privately owned and occupied vehicles – in an attempt to slow, stop or funnel the driver towards the lane where the spike strips were to be laid. Munoz caused oncoming traffic to come to a stop with the intention of fortifying the HPD barricade. One of the cars brought to a stop by Munoz was the vehicle carrying Mr. Roques and Mr. Sewell. Munoz did not wave Mr. Roques or Mr. Sewell through because he needed their vehicle and others in his attempt to stop, slow or funnel the driver towards the lane where the spike strips were to be laid.

34. Defendants Munoz and Hatcher stopped all westbound traffic with the plan of placing "spike strips" in a single lane they hoped to funnel the driver through. Stopping traffic formed a roadblock with privately owned and occupied vehicles immediately west, and on the blind side of, the North Wayside overpass. This location was a death trap. The driver and the pursuit had to travel over an overpass before reaching the blockade. The soonest the blockade was visible to the driver was at the apex of the overpass and the blockade was set up just a short distance after the apex. Munoz and Hatcher configured the termination apparatus on the blind

[1] The two lanes closest to the center of the freeway and dividing concrete barrier wall are lanes three and four. Lanes one and two are closest to the right shoulder.

side of the overpass, following a curve, on a freeway at night, and knowing the suspect was traveling at least 80 miles per hour. Munoz and Hatcher erected the roadblock in this location to surprise the driver and ensure she did not escape. Munoz and Hatcher informed Ulloa, Olivarez, Hightower, Riggs, Craig, and Curry about the roadblock and told these officers to herd the driver towards their man-made death trap. Neither Hatcher nor Munoz made any effort to warn, or clear from the roadway, the innocent occupants of the vehicles who unwittingly made up the blockade. Rather, they condemned these vehicles to serve as a blockade. Erecting a roadblock and attempting to use spike strips in this manner clearly created and increased the danger to Roques, Sewell and the other motorists stopped by HPD.

35. Once the driver crested the North Wayside overpass and spotted the roadblock, her car began braking, skidded and slammed into the back of Mr. Roques and Mr. Sewell's car crushing their vehicle and its occupants. The driver's vehicle then continued forward and finally came to a stop after crashing into the back of an 18-wheeler that had also been stopped by Hatcher and Munoz. The collision rendered Mr. Roques and Mr. Sewell unconscious, and both were rushed to the hospital. As a result of the collision, both Mr. Roques and Mr. Sewell suffered severe brain damage and cannot care for themselves.

36. Bailey is the final policymaker for Precinct 8. While Precinct 8 has a "Use of Emergency Vehicle Equipment Policy,"[2] the policy has no guidance for roadblocks or methods to terminate pursuits. The policy recognizes that pursuit is likely. Section 38.01 states, "Departmental vehicles shall not be used *to force a pursued vehicle* off the roadway or engage in other techniques that unduly raise the risk of collision." **Exhibit A**, Harris County Constable Precinct 8, Use of Emergency Vehicle Equipment, § 38.01(C). The policy, however, contains no

[2] Obtained through two Open Records Requests, pursuant to Tex. Gov't Code § 552.221, dated April 30 and May 20, 2010.

guidance regarding initiating a pursuit, conducting a pursuit, the use of force with a pursuit, communications during a pursuit, supervisor responsibilities, abandoning or terminating the pursuit, roadblocks, or administrative reviews. *Contra* **Exhibit C**, Harris County Constable Precinct 7, General Order No. 600-02 (May 1, 2005).[3] Bailey, thus, was deliberately indifferent to Mr. Roques and Mr. Sewell's Fourth and Fourteenth Amendment rights by refusing to promulgate or implement policy regarding roadblocks, methods to terminate vehicular pursuits, or pursuits in general.

37. Freeman is the final policymaker for Precinct 2. Precinct 2 has no policies regarding roadblocks or motor vehicle pursuits. *See* **Exhibit B**. Rather than implementing policies to protect motorists from unnecessary risks with roadblocks, Precinct 2 states, "The situation on hand and the decision on such matters are up to the deputy's discretion." *Id.* Freeman, thus, was deliberately indifferent to Mr. Roques and Mr. Sewell's Fourth and Fourteenth Amendment rights by refusing to promulgate or implement policy regarding roadblocks, methods to terminate vehicular pursuits, or other issues relating to pursuits in general.

## CAUSES OF ACTION

### A. State-Created Danger (As to All Defendants)

38. Defendants created a state-created danger, which violated Mr. Roques and Mr. Sewell's Fourteenth Amendment substantive due process right to bodily integrity.

39. By affirmatively using privately owned and occupied vehicles in a roadblock, Defendants produced a distinct and dangerous situation. Defendants stopped westbound traffic on I-10 to catch the driver. The roadblock, however, not only stopped the driver, but numerous privately owned and occupied vehicles. As a result, these vehicles became HPD's and the

[3] Reference to this Precinct 7 policy is not an admission the policy is constitutional or a model.

County's first line of defense, serving to fortify the HPD roadblock. Not only did Defendants' conduct affirmatively place Mr. Roques and Mr. Sewell in danger, but it increased their vulnerability. Using the car as a roadblock placed them within the zone of risk.

40. Roadblocks are inherently dangerous, and Defendants knew the dangers posed. In fact, Defendants positioned themselves behind the roadblock – on the western and safe side of the roadblock and out of harm's way – while leaving Roques, Sewell and the other innocent motorists on the eastern and dangerous side of the roadblock to absorb the impact. In essence, Defendants used Sewell, Roques and the other unsuspecting motorists as a human barrier to stop the oncoming driver.

41. Defendants used their inherent law enforcement authority to produce a man-made danger. Absent extreme circumstances, highway traffic moves freely. Only limited government agencies have authority to stop or slow traffic, law enforcement being one. Without stopping traffic and leaving privately owned and occupied vehicles in harm's way, Mr. Roques and Mr. Sewell would have passed freely.

42. Defendants were the only parties involved with creating the roadblock. Defendants made a concerted effort to terminate the police chase with the roadblock by stopping traffic and chasing the driver into their trap.

43. Reasonable officers recognize that using privately owned and occupied vehicles as a roadblock violates a clearly established right to bodily integrity.

44. Defendants Hurtt, Bailey, and Freeman failed to train and supervise their employees. Bailey and Freeman had no policies regarding roadblocks or methods to terminate motor vehicle pursuits. As a result, neither Bailey nor Freeman trained their subordinates, Curry and Craig respectively, on proper use of roadblocks or methods to terminate pursuit. In addition, Hurtt failed to train Hatcher and Munoz how to deploy "spike strips" or erect a roadblock safely,

and failed to train Ulloa, Olivarez, Hightower, and Riggs that officers cannot concertedly herd a fleeing vehicle into a roadblock made with privately owned and occupied vehicles. Hurtt, Bailey, and Freeman are directly liable to Plaintiffs because there is an affirmative link between subordinate misconduct and their inaction.

45. First, they failed to train and supervise their employees. These employees formed a state-created danger – a roadblock made with privately owned and occupied vehicles. At the time of the incident, Hurtt, Bailey, and Freeman were final policymakers for their respective organizations. They had final responsibility for training and supervising their employees. Their failure to train and supervise their employees' use of roadblocks or methods to terminate pursuit directly caused Mr. Roques and Mr. Sewell's harm.

46. Second, Hurtt, Bailey, and Freeman's failure was deliberately indifferent to Mr. Roques and Mr. Swell's constitutional rights. Defendants knew of the inherent risks with ending a pursuit, which is why law enforcement organizations have policies and require training on their proper termination. Nevertheless, Defendants Hurtt, Bailey, and Freeman knowingly disregarded this risk and failed to train and supervise their officers.

47. City customs and practices, and Harris County policies, customs, and practices affirmatively create dangers for persons traveling on freeways. These policies, customs, and practices use privately owned and occupied vehicles as a means to end police chases. The City and County, further, know of the danger, yet they fail to provide any specific guidelines to safeguard the public. HPD and Harris County Constables have authority to block traffic only through their official law enforcement authority.

B. Unreasonable Seizure (As to All Defendants)

48. Defendants' actions violated Mr. Roques and Mr. Sewell's rights under the Fourth and Fourteenth Amendments.

49. Defendants erected a roadblock across I-10, stopping all westbound traffic. Defendants used their law enforcement authority to create this roadblock. The roadblock restrained Mr. Roques and Mr. Sewell's liberty by prohibiting them from passing. Neither Mr. Roques nor Mr. Sewell was free to leave. Defendants *de facto* seized their vehicle and used it in the blockade. Defendants terminated Mr. Roques and Mr. Sewell's freedom through the means intentionally applied – a roadblock.

50. Defendants acted under color of law and with official authority. Their actions were intentional and completely, deliberately, consciously, and callously indifferent to Mr. Roques and Mr. Sewell's constitutional rights. Defendants' actions deprived them of their right to be free from unreasonable seizure, which proximately caused injury.

51. HPD and Harris County Constables routinely execute roadblocks involving privately owned and occupied vehicles. Since 2006, HPD has terminated 123 vehicle pursuits by roadblock or a tire deflation device (e.g., STINGER). Of those pursuits, 15% of those ending with a roadblock have caused collision with an innocent bystander; 25% of those ending with tire deflation devices have involved a collision with innocent bystanders. Terminating a search with tire deflation devices requires some type of roadblock or traffic flow to funnel a suspect through a small area with the deflation device. HPD and the County regularly use the general public as the barrier to funnel a suspect over tire deflation devices. The organizations also have a custom of stopping all traffic with these roadblocks and tire deflation devices, which makes privately owned and occupied vehicles part of the blockade. This type of seizure is a matter of practice, custom, and *de facto* policy for both the City and County.

52. The County, further, has no policy regarding roadblocks or methods to terminate a pursuit. Neither Precinct 8 nor Precinct 2 has policies regarding roadblocks or methods to terminate a pursuit.

53. Reasonable officers recognize that using privately owned and occupied vehicles as a roadblock violates a clearly established right to bodily integrity.

C. The Police Roadblock Shocks the Conscience (As to All Defendants)

54. Defendants' conduct – using privately owned and occupied vehicles in a roadblock – shocks the conscience. All the officers worked together, in concert, to stop the driver's flight. Not only did Hatcher and Munoz erect a barricade with privately owned and occupied vehicles, but the other officers and constables – Ulloa, Olivarez, Hightower, Riggs, Craig, and Curry – all pursued the driver at high speeds, on a Houston freeway, and with knowledge that James' vehicle could be easily located through global positioning. The driver had no weapon – James retrieved his shotgun before she fled. Further, these officers knowingly herded the driver into the human-barricade near North Wayside Avenue. Defendants' conduct was brutal, offensive, and inconsistent with traditional notions of fair play and decency.

55. HPD and the County, pursuant to their individual policies, customs, and practices, regularly employ these types of roadblocks that shock the conscience.

D. Failure to Train and Supervise (As to Defendants Hurtt, Bailey, and Freeman)

56. Defendants Hurtt, Bailey, and Freeman failed to supervise and train HPD officers and Harris County deputy constables involved with the pursuit and roadblock. This failure to supervise and train was deliberately indifferent to Mr. Roques and Mr. Sewell's constitutional rights because proper supervision and training would ensure that the officers refrained from using privately owned and occupied vehicles in a roadblock. Had Hurtt, Bailey, and Freeman supervised and trained their employees, Mr. Roques and Mr. Sewell would have been safe.

57. Defendants had a constitutional duty to supervise and train the officers and deputy constables to protect Mr. Roques and Mr. Sewell from the officers' wrongful acts, omissions, and unconstitutional seizure.

58. Further, HPD's and Harris County's supervisory and training polices are unconstitutional, in practice, because they inadequately supervise and fail to adequately train stopping techniques. Said polices also fail to ensure HPD and the County avoid using privately owned and occupied vehicles as roadblocks.

59. HPD and Harris County's constitutionally-flawed supervision and training of the officers and deputy constables deprived Mr. Roques and Mr. Sewell of their constitutional rights and proximately caused them harm.

DAMAGES

60. Plaintiffs seek actual damages against Defendants, jointly and severally, for the injuries that Mr. Roques and Mr. Sewell suffered at Defendants' hands, including medical care, loss of earnings, loss of earning capacity, impairment, pain, suffering, mental anguish, disfigurement, as well as loss of care, comfort, support, and consortium, all of which damages Plaintiffs have suffered in the past and will continue to suffer into the future.

61. Since the incident, Mr. Roques and Mr. Sewell both require full-time care. The incident caused each of them severe brain trauma and neither Mr. Roques nor Mr. Sewell will ever be able to obtain gainful employment. As a result, both of their minor children, J.S. and D.S., have lost their right to paternal support.

62. Plaintiffs also seek pre-judgment interest, interest on the judgment, costs, and such other and further relief the Court may order.

63. Because of the willful, wanton, and malicious nature of Defendants' conduct – using a privately owned and occupied vehicle as a roadblock – Plaintiffs seek punitive damages against each individual law enforcement Defendant.

DECLARATORY & INJUNCTIVE RELIEF

64. Plaintiffs seek declaratory relief that all Defendants violated their rights under the U.S. Constitution, as described above.

65. Plaintiffs seek to enjoin all Defendants from using privately owned and occupied vehicles as roadblocks, which violates the U.S. Constitution.

ATTORNEYS' FEES

66. Plaintiffs seek attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

PRAYER FOR RELIEF

THEREFORE, Plaintiffs respectfully pray that this Court:

A. Enter declaratory judgment that, acting under color of law and with authority, Hatcher, Munoz, Ulloa, Olivarez, Hightower, Riggs, Craig, and Curry intentionally, and with complete and deliberate indifference to Plaintiffs' rights, deprived them of their right to be free from unreasonable seizure under the Fourth and Fourteenth Amendments to the Constitution;

B. Enter declaratory judgment that all Defendants had an obligation to protect Plaintiffs after generating a state-created danger, and failing to protect them violated their Fourteenth Amendment rights to bodily integrity;

C. Enter declaratory judgment that Hatcher, Munoz, Ulloa, Olivarez, Hightower, Riggs, Craig, and Curry conducted themselves in a manner that shocks the conscience and violated the Fourteenth Amendment throughout the pursuit;

D. Enter declaratory judgment that Hurtt, Bailey, and Freeman failed to train and supervise Hatcher, Munoz, Ulloa, Olivarez, Hightower, Riggs, Craig, and Curry;

E. Enter declaratory judgment that the City's and County's policies and customs regarding pursuits and the use of privately owned and occupied vehicles as roadblocks violate the Fourth and Fourteenth Amendments;

F. Award compensatory damages, jointly and severally, against each Defendant, as appropriate and allowed by law;

G. Award punitive damages, jointly and severally, against Hurtt, Bailey, Freeman, Hatcher, Munoz, Ulloa, Olivarez, Hightower, Riggs, Craig, and Curry, as appropriate and allowed by law;

H. Grant injunctive relief against the City and County from continuing to use privately owned and occupied vehicles in roadblocks, in the manner set out above;

I. Grant reasonable attorneys' fees, litigation expenses, including, but not limited to, expert fees and court costs; and,

J. Grant damages as prayed for above and for such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled.

Dated: August 30, 2010.

JURY TRIAL DEMANDED

Respectfully submitted,

Michael S. Callahan (ATTORNEY-IN-CHARGE)
Texas Bar No. 00790416
Casey M. Brown
Texas Bar No. 24031768

THE CALLAHAN LAW FIRM
440 Louisiana Street, Suite 2000
Houston, Texas 77002
(713) 224-9000
(713) 224-9001 (fax)

ATTORNEYS FOR PLAINTIFFS

/s Todd Batson[4]
Todd D. Batson
New York Bar No. 4769154
James C. Harrington
Texas Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, Texas 78741-3438
(512) 474-5073
(512) 474-0726 (fax)

ATTORNEYS FOR PLAINTIFFS

[4] Todd D. Batson has filed a motion to appear in this case *pro hac vice* in conjunction with this filing.

**EXHIBIT A**

USE OF EMERGENCY VEHICLE EQUIPMENT

38.00 The nature of law enforcement on occasion requires a Deputy to use emergency equipment either for the purpose of vehicular pursuit or when responding to calls. Using this equipment creates a danger for all concerned. The decision to use this equipment shall be made only after weighing all consequences which could be expected to result from such actions. Weather conditions, traffic density, and geographical concerns all should be considered. The importance of apprehension in a pursuit, or the importance of arriving at the scene of an emergency at the first possible instant must be carefully weighed against the hazards created by the use of emergency equipment and high speed.

38.01 The policy of the Department shall be as follows as regards high speed driving and use of the Emergency Equipment.

A. In the event that emergency equipment is used to facilitate a high-speed pursuit or high-speed driving to the scene of an emergency, the dispatcher shall be notified immediately upon commencing such action.

B. A vehicular pursuit shall be abandoned when the hazard becomes too high, exposing the Deputy, the violator or the general public to unwarranted risks or when conditions clearly indicate the futility of further pursuit.

C. Departmental vehicles shall not be used to force a pursued vehicle off the roadway or engage in other techniques that unduly raise the risk of collision.

D. Emergency equipment shall not be used for escorts without prior approval from a supervisor.

E. Emergency equipment will not be employed when unauthorized personnel are present in the police vehicle, i.e. prisoners, citizen riders etc.

F. In the event of an accident occurring during the use of emergency equipment, a supervisor shall be notified, and an investigation of the accident shall take place. An Officer from another Department in whose jurisdiction the accident occurs shall be requested to make an official report of the accident.

38.02 Deputies shall be familiar with the Statute governing use of emergency equipment as stated in Chapter 546 of the Texas Transportation Code:

**§ 546.001. Permissible Conduct**

In operating an authorized emergency vehicle the operator may:

(1) park or stand, irrespective of another provision of this subtitle;

(2) proceed past a red or stop signal or stop sign, after slowing as necessary for safe operation;

(3) exceed a maximum speed limit, except as provided by an ordinance adopted under Section 545.365, as long as the operator does not endanger life or property; and

(4) disregard a regulation governing the direction of movement or turning in specified directions.

**§ 546.002. When Conduct Permissible**

Section 546.001 applies only when the operator is:

(1) responding to an emergency call;

(2) pursuing an actual or suspected violator of the law; or

(3) responding to but not returning from a fire alarm.

**§ 546.005. Duty of Care**

This chapter does not relieve the operator of an authorized emergency vehicle from:

(1) the duty to operate the vehicle with appropriate regard for the safety of all persons; or

(2) the consequences of reckless disregard for the safety of others.

# EXHIBIT B



*Gary L. Freeman*
CONSTABLE PCT. 2
109 E. SHAW
PASADENA, TEXAS 77506




June 1, 2010

Mr. Todd Batson
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741

Mr. Batson

In regards to your Open Record Request regarding Harris County Constable Precinct 2 vehicle pursuits. This agency does not have a policy regarding vehicle pursuits. The situation on hand and the decision on such matter are up to the deputy's discretion.

If you have any questions or comments, please feel free to contact Cpt. Philips or Chief Biehunko for clarification at 713-477-2766.

Sincerely,

Jorge Mendoza
Communications Supervisor
Harris County Constable Pct2

**EXHIBIT C**

| General Orders Harris County Constable Precinct 7 | ISSUE DATE: May 1, 2005 | NUMBER: 600-02 |
|---|---|---|
| | REVISION DATE: (X) New () Revised () Rescinds: | |
| SUBJECT: Emergency Driving | | |

**PHILOSOPHY**
The operation of a motor vehicle is a significant responsibility for any law enforcement officer. The relative density of businesses, residents, pedestrians, and street conditions are factors that must be considered when operating a motor vehicle. The necessity of emergency driving amplifies the responsibility that officers must shoulder. It is a necessity that a procedure providing guidance for the operation of a motor vehicle be developed that balances the need for emergency response against the safety of the officer and the safety of the public.

**1. CALLS FOR SERVICE**

A. All deputies will adhere to the Texas Transportation Code, Subchapter A, Authorize Emergency Vehicles; section 546.001-546.005, during all responses to call for service.

B. All persons, except where specifically exempted by the Texas Transportation Code, will use the safety belt restraining system while operating or riding in a Department vehicle.

**2. RESPONSE PRIORITIES**
Deputies may only exceed the legal speed limit when such excessive speed is reasonable, prudent, and in compliance with this procedure, considering the potential hazards. A deputy will use emergency equipment in response to calls for service only when specifically authorized by Department guidelines of Texas law. A primary or secondary unit may modify the priority response in accordance with the guidelines set forth in this procedure. A deputy will notify the dispatcher of any change.

A. Priority One: Use emergency lights and siren. Proceed to the location by direct route. Slow in a manner that would allow stopping, if necessary, before entering the intersection of any intersection where a traffic control device would normally require stopping, and then proceed through the intersection when safe. Condition that will require a priority one response are:
   1. Any apparent threat to life or danger of serious bodily injury.
   2. An ongoing felony or misdemeanor that involves violence and may result in injury.
   3. A felony or misdemeanor that has occurred and reason exists to believe that the suspect is still in the area.
   4. An incident that involves urgent or unique circumstances that demands an immediate police response; and/or
   5. An "assist the officer" or any request from an officer for a priority one response

B. Priority Two: Immediate response with the discretionary use of emergency equipment and the duty to operate the vehicle with appropriate regard for the safety of all persons. A priority two response is indicated when an officer's presence is needed at the scene but the need is not immediate. Conditions that will define a priority two response are:
   1. An incident that does not represent a significant threat to life or a felony that has occurred without injury and the suspect has fled the area.
   2. Any in-progress incident that could be classified as a possible crime (i.e. suspicious person or vehicle); and/or
   3. An incident that represents a significant hazard to the flow of traffic, emergency equipment can be utilized to expedite the safe arrival of the responding officer(s).

C. Priority Three: Does not involve a threat to life or property and which a delayed response would not adversely affect the outcome. The use of emergency equipment is not authorized. Obey all traffic laws. Situations that would dictate a priority three response are:
   1. Report calls
   2. Transport a prisoner
   3. Parking violations
   4. Lost, found, or abandoned property

**3. PURSUIT DRIVING**

The pursuit and apprehension of a suspect in a moving motor vehicle should be considered hazardous driving. At the police officer's discretion, he or she may terminate a pursuit at any time that it becomes excessively dangerous to the officers or innocent citizens. Self-preservation and consideration of the safety of innocent persons is a necessary element in any pursuit.

A. Initiating a Pursuit: Pursuit of a suspect may be engaged whenever a reasonably-prudent deputy, under the same or similar circumstances, could believe, in the exercise of discretion, that the need immediately to apprehend the suspect outweighs a clear risk of harm to the public in initiating, in continuing, and in discounting the pursuit.
   1. A pursuit should not be initiated if the violation that the occupant is wanted for is a non-hazardous misdemeanor and the violator can reasonable he expected to be identified and apprehended with the benefit of an arrest warrant.
   2. Deputies will not engage in a vehicle pursuit when the only offense is Evading Arrest or Detention, Fleeing or Attempting to Elude a Police Officer or one classified as a Class C violation. Deputies will not become engage in another agency's pursuit when they have reason to believe that the facts are the same.
   3. Deputies will not engage in a pursuit if the vehicle they are operating is a pick-up truck, van, or SUV regardless of the fact that it is equipped and marked as a police emergency vehicle.
   4. The deputy should consider the following when judging the risk factors of a pursuit:

a. Traffic conditions
b. Time of day
c. Pedestrian traffic
d. Weather conditions
e. Road conditions
f. Visibility, obstruction and lighting
g. The deputy's own personal condition
h. The condition of the deputy's vehicle
i. The deputy's familiarity with the area
j. The nature and seriousness of the offense
k. The risk to the public it the suspect is allowed to escape

B. Conduction a Pursuit

1. There should be no more than two patrol vehicles actively involved in a pursuit, the primary vehicle and the secondary vehicle. Any other police vehicles in the vicinity may move in the direction of the pursuit in order to provide assistance, of necessary.
2. Harris County Constable Precinct 7 vehicles may join a pursuit originated by an outside agency if the outside agency does not have a secondary vehicle and the appropriate criteria has been met to engage in a pursuit. If the vehicle from the originating jurisdiction abandons the pursuit, the Constable Precinct 7, vehicle should also abandon the pursuit unless circumstances dictate that the Constable Precinct 7 should continue. Such an instance may be a mechanical breakdown of the primary agency has another of its units join the pursuit and it assumes the secondary position.
3. Unmarked vehicles or police vehicles without emergency equipment may not initiate a pursuit.
4. At no time should a police vehicle join a pursuit when that vehicle has civilian personnel aboard. If a deputy observes an offense, he should advise the dispatcher of the situation and deposit the civilian passenger at a place of safety before becoming engaging in a pursuit.
5. At no time will deputies purse a vehicle against the normal flow of traffic except in those cases that involve serious bodily injury or death or the imminent threat of serious bodily injury or death.
6. At no time will deputies in the course of a pursuit, engage in bumping, ramming, pushing or forcing the target vehicle off the roadway or other actions involving physical force including the pretence of force unless, such action is justified under the department's Use of Deadly Force directive.
7. Deputies will not pass or pull up besides the target vehicle in the course of the chase, but continue to follow the fleeing vehicle at their discretion. The deputy will maintain sufficient space between the two vehicles to give the deputy an opportunity to avoid an accident should the target vehicle come to a sudden stop or perform an unexpected maneuver.

C. Pursuits and Use of Force

At no time will deputies fire at or use any form of deadly force against the occupants of a motor vehicle unless deadly force or the threat of deadly force emanates from a weapon other than the vehicle, or unless deadly force or the threat of deadly force is used by the occupant(s) of the vehicle towards a third party.

D. Pursuit Communication

1. Immediately upon initiating a pursuit, the deputy will notify the dispatcher of the pursuit, giving their location and the direction of the fleeing vehicle.
2. Once a pursuit begins, the dispatcher will advise all other units to reframe from making anything other than emergency transmissions.
3. The pursuing deputy should continue to broadcast the progress of the pursuit as well as a description of the fleeing vehicle and its occupant (s).
4. As soon as a secondary vehicle joins the pursuit, the secondary vehicle may assume the responsibility of broadcasting the progress of the pursuit.
5. The dispatcher will maintain a record of transmissions by the primary and secondary vehicles.
6. The dispatcher will notify the on-duty or on-call supervisor that a pursuit is in progress.
7. The dispatcher will immediately notify the primary law enforcement agency of the pursuit and keep it informed of the progress.

E. Supervisor Responsibilities

1. The supervisor of the unit involved in the pursuit will monitor the progress of the pursuit and issue appropriate instructions
2. Following the initial pursuit by the primary unit, the supervisor may give authorization for the pursuit to continue or to terminate.
3. The supervisor may request additional support from within or outside of the department.

F. Abandoning a Pursuit

A pursuit should be abandoned when any of the following occur:

1. The deputy becomes nervous or "shaky" to a point that judgment and/or coordination are adversely impaired and they are unable to safely continue the pursuit.
2. The performance capabilities of the deputy's vehicle are significantly reduced such as by mechanical malfunction.
3. The deputy determines that the risk factors have changed such that the need to apprehend the suspect no longer outweighs the risks associated with continuing the pursuit.
4. If directed to abandon the pursuit by a supervisor.

G. Roadblocks
The implementation of roadblocks is prohibited to all members of the department.

H. Administrative Review of a Pursuit
1. As soon as practical the primary and secondary officers will complete a Pursuit Report form.
2. The Pursuit Report form will be turned into the deputy's immediate supervisor and will be reviewed up the chain of command.
3. Disciplinary action against a deputy is prohibited when such action is based solely on the deputy's decision to not become involved in a vehicle pursuit or to terminate a pursuit based on articulable reasons.
4. Upon review by the Chief Deputy, recommendations for additional training or modification of procedures and Department guidelines may be made.
5. For annual review and statistical analysis purposes, the Records Section will retain the Pursuit Report forms.