# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| LISA BEAN KEMP, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-10-3111 |
| | § | |
| CITY OF HOUSTON, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

## ORDER

Pending before the court are (1) an amended motion for summary judgment filed by defendant City of Houston (the "City")(Dkt. 147); and (2) a motion to exclude the last paragraph of the affidavit of Assistant Police Chief Slinkard as inadmissible hearsay, which is contained in the response the plaintiffs filed to the City's motion for summary judgment (Dkt. 151). Having considered the motions, related filings, and the applicable law, the court is of the opinion that the City's motion for summary judgment should be DENIED and the motion to strike should be GRANTED IN PART AND DENIED IN PART.

## I. BACKGROUND

This is a civil rights case brought by the guardians of Mecole Roques and his minor child and Dexter Sewell and his minor children ("Plaintiffs"). Dkt. 132. It arose on January 14, 2009,when the vehicle in which Roques and Sewell were traveling on Interstate-10 in Houston, Texas, encountered what Plaintiffs term a "roadblock" set up by the Houston Police Department ("HPD"). HPD was attempting to assist Harris County in stopping a person who had stolen a police car and was being pursued in a high-speed chase, Catrinna Miller. They decided to set out spike strips to force Miller to stop. Officer R.T. Hatcher, who parked his police car with lights flashing on the far

right shoulder, was attempting to set out the strips in the far left lane of the freeway.  Dkt. 147.

Defendants assert that Hatcher planned to extend the cord of the spike strip to where his vehicle was

parked and then pull the cord so that the spikes were in the correct lane as soon as he saw which lane

Miller was in.  *Id.*  Defendants claim there were five lanes on I-10 at the spot in which Hatcher was

attempting to lay the spike strips, and they call the far left lane "Lane 1."  *Id.*  Plaintiffs assert that

there were only four lanes, and the lane on the far right was an entry ramp that had terminated before

the site of the roadblock.  Dkt. 151 n.44.  The far left lane is Lane 1, the second from the left lane

is Lane 2, and so on.  Officer W.G. Munoz, who had been stopping traffic from coming onto the on-

ramp, moved his vehicle so that it was perpendicular to the oncoming traffic in an attempt to provide

Hatcher with an area to attempt spike deployment.  Dkt. 147.  He parked it either between Lanes 2

and 3 or 3 and 4.  *See* Dkts. 132, 147.  Plaintiffs contend that Munoz parked it so that automobiles

in Lanes 2, 3, and 4 could not pass.  Dkt. 132.  Plaintiffs allege that Munoz then caused oncoming

traffic to come to a stop on the freeway by raising his left arm with his palm facing the vehicles.  *Id.*

It is undisputed that a Volkswagen and an 18-wheeler and came to a stop in Lanes 2 and 3,

respectively.  Dkt. 147.  Roques and Sewell's vehicle was either stopped or was coming to a stop in

Lane 2 behind the Volkswagen.  *See* Dkt. 147, 151.  Miller's vehicle then crashed into the

"roadblock" of cars, hit Roques and Sewell's car, and rendered them unconscious.  Dkt. 132.

Plaintiffs allege that Roques and Sewell both have severe brain damage and cannot care for

themselves as a result.  *Id.*

Plaintiffs filed their original complaint against the City of Houston, Harris County, Charles

A. McClelland, Jr., Harold Hurtt, Bill Bailey, Gary Freeman, R.T. Hatcher, W.G. Munoz, A. Ulloa,

J.M. Olivarez, Officer Hightower, D.A. Riggs, Jason Curry, and Troy Craig, on August 30, 2010.

2

Dkt. 1.  In the original complaint, Plaintiffs asserted claims relating to Harris County's high-speed chase of Miller and HPD's roadblock.  *Id.*  Plaintiffs recently narrowed their claims and now assert claims against only the City of Houston, former HPD Chief of Police Harold Hurtt, Munoz, and Hatcher.  Dkt. 132.  Their claims all stem around the alleged roadblock.  *Id.*  Plaintiffs assert claims against all defendants for a state-created danger, an unreasonable seizure, and a police roadblock that shocks the conscience, and they assert a claim against the City of Houston and Hurtt for failure to supervise and train HPD officers Hatcher and Munoz.  *Id.*

The City of Houston moves for summary judgment on all of Plaintiffs' claims.  Dkt. 147.  The City argues that the court should dismiss the state-created danger claim because neither the U.S. Supreme Court nor the Fifth Circuit has adopted this type of claim, and, even if this court were to expand the parameters of the claim, Plaintiffs cannot establish that Defendants acted with deliberate indifference, which is required to establish a state-created danger claim.  *Id.*  According to Defendants, the shocks-the-conscience claim should also be dismissed because there is no evidence of deliberate indifference or specific intent to injure the Plaintiffs.  *Id.*  Defendants argue that the roadblock claim also fails as a matter of law because the allegations of a "roadblock" do not meet the legal definition of a roadblock.  *Id.*  Finally, Defendants assert that Plaintiffs' Fourth Amendment seizure claims fail because (1) there was no intent to seize by Defendants, who did not even know Plaintiffs' car was at the scene; and (2) Plaintiffs fail to establish the elements of a *prima facie* case against a municipality under 42 U.S.C. § 1983.  *Id.*

With regard to the state-created danger claim, Plaintiffs assert that, while the Fifth Circuit has not *adopted* the theory, it has given district courts instructions regarding what would be required to successfully bring the claim.  Dkt. 151.  Plaintiffs assert that the City's officers created a

roadblock with civilian occupied vehicles in violation of HPD policy and federal law, and that this creation of a roadblock shocks the conscience. *Id.* They argue that, regardless of the officers' intent, they seized Roques and Sewell's vehicle in violation of the Fourth Amendment, and that the City should be held liable for failing to properly train Roques and Sewell on the proper use of roadblocks. *Id.* Plaintiffs also move to exclude a portion of an affidavit that Defendants provide as summary judgment evidence. *Id.* The court will first address the evidentiary issue and will then turn to the motion for summary judgment.

## II. OBJECTION TO EVIDENCE

Defendants submit the affidavit of Assistant Police Chief M. Slinkard as part of their summary judgment evidence. Dkt. 148-17. Plaintiffs argue that the last paragraph of Slinkard's affidavit is not admissible and thus not appropriate summary judgment evidence because it contains inadmissible hearsay. Dkt. 151. Specifically, the last paragraph contains hearsay statements made by the City's attorneys. *Id.* Plaintiff's thus move to strike the last paragraph of Slinkard's affidavit. *Id.*

In the last paragraph of his affidavit, Slinkard states:

> It is my understanding that Assistant Chief G. Buenik has reviewed the incident reports, pursuit data, and/or pursuit forms from January 1, 2003 to at least the date of the subject incident, January 14, 2009. That information reviewed by Chief Buenik is the best evidence and most reliable and accurate way to determine how these pursuits actually ended and/or were terminated. In producing the charts to Mr. Batson it was neither my intention nor Mr. Monk's intension to suggest that these numbers accurately reflected termination solely by roadblocks and/or spike strips. Mr. Monk and I attempted to explain the unreliability of those charts in the letter dated March 19, 2010.

Dkt. 148-17.   During his deposition, Plaintiffs' counsel asked how Slinkard came to the understanding with regard to Buenik's review of the reports. Dkt. 151, Ex. W at 28.  Slinkard stated that he "got that understanding" from "City Legal."  *Id.*  The court agrees that the first sentence of the last paragraph of Slinkard's affidavit is inadmissible.  However, there is no reason to strike the rest of the paragraph.  Accordingly, Plaintiffs' motion to strike the paragraph is GRANTED IN PART AND DENIED IN PART.  It is GRANTED to the extent that the first sentence of the last paragraph of Slinkard's affidavit is hereby STRICKEN.  It is otherwise DENIED.

### III. MOTION FOR SUMMARY JUDGMENT

**A.    Legal Standard**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986).  An issue is "material" if its resolution could affect the outcome of the action.  *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).  "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

5

317, 323, 106 S. Ct. 2548 (1986).  Only when the moving party has discharged this initial burden

does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material

fact.  *Id.* at 322.  If the moving party fails to meet this burden, then it is not entitled to a summary

judgment, and no defense to the motion is required.  *Id.*  "For any matter on which the non-movant

would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence

and thereby shift to the non-movant the burden of demonstrating by competent summary judgment

proof that there is an issue of material fact warranting trial."  *Transamerica Ins. Co. v. Avenell* , 66

F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25.  To prevent summary

judgment, "the non-moving party must come forward with 'specific facts showing that there is a

genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587,

106 S. Ct. 1348 (1986) (quoting Fed. R. Civ. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the

light most favorable to the non-movant and draw all justifiable inferences in favor of the non-

movant.  *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008).  The

court must review all of the evidence in the record, but make no credibility determinations or weigh

any evidence; disregard all evidence favorable to the moving party that the jury is not required to

believe; and give credence to the evidence favoring the non-moving party as well as to the evidence

supporting the moving party that is uncontradicted and unimpeached.  *Moore v. Willis Ind. Sch.

Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).  However, the non-movant cannot avoid summary judgment

simply by presenting "conclusory allegations and denials, speculation, improbable inferences,

unsubstantiated assertions, and legalistic argumentation."  *TIG Ins. Co. v. Sedgwick James of Wash.*,

276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en

banc).  By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts."  *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

**B.     State Created Danger**

Plaintiffs assert that "Defendants created a danger which violated Mr. Roques['s] and Mr. Sewell's Fourteenth Amendment substantive due process right to bodily integrity."  Dkt. 132.  The City argues that the court should grant judgment in its favor on this claim because the Fifth Circuit has never recognized, and in fact has rejected, the state-created danger theory of substantive due process.  Dkt. 147.  The City additionally points out that the U.S. Supreme Court has noted that courts should be "reluctant to expand" the concept embodied in state-created danger and describes this as an "uncharted area."  *Id.* (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S.115, 125, 112 S. Ct. 1061 (1992).  The City argues, though, that even if this court were to recognize a state-created danger theory, Plaintiffs' claims under the theory must fail because Plaintiffs cannot show (1) that the state actors increased danger to Roques and Sewell; or (2) that the state actors acted with deliberate indifference.  *Id.*  Moreover, the City argues that even if they Plaintiffs could show an increased danger or deliberate indifference, they must show that there was a special relationship between the Officers and Roques and Sewell such as incarceration or institutionalization, and there was not a special relationship here.  *Id.*

Plaintiffs acknowledge that the Fifth Circuit has declined to adopt the state-created danger theory.  Dkt. 151.  However, they point out that the Fifth Circuit has provided a roadmap to pleading a claim for state-created danger and that they plead the claim in detail.  *Id.*  Additionally, Plaintiffs point to evidence that they claim raises issues of material fact as to whether Defendants increased

7

danger to Plaintiffs and acted with deliberate indifference, and they argue that there is no need to show a special relationship exists to prove state-created danger. *Id.*

The Fifth Circuit has indeed declined to adopt a state-created danger theory numerous times. *See Doe ex rel. Magee v. Covington Cnty. Schl. Dist. ex rel. Keys*, 675 F.3d 849, 865 (5th Cir. 2012) (discussing previous cases that declined to adopt the theory). In fact, the Fifth Circuit has *recently* affirmed in an *en banc* opinion that it has *not* adopted the theory. *Id.* It noted, however, that it was declining to adopt the theory because the allegations in that case did not support the theory. *Id.* This reasoning coupled with a review of prior cases in which the Fifth Circuit declined to adopt the theory leads the court to conclude that it is appropriate for district courts to entertain the theory even though the Fifth Circuit has not adopted it. For instance, in *Scanlon v. Texas A&M University*, the district court dismissed the plaintiffs' claims under the state-created danger theory for failure to state a claim. *Scanlon v. Tex. A&M Univ.*, 343 F.3d 533, 535 (5th Cir. 2003). On appeal, the Fifth Circuit noted that it had not adopted the theory, yet it remanded the case to the district court because the district court should have found that the plaintiffs had stated a section 1983 claim under the state-created danger theory. *Scanlan*, 343 F.3d at 537-38. Thus, even though the Fifth Circuit has not found a circumstance in which it believed the evidence (as opposed to the pleadings) supported the theory and consequently adopted the theory, the Fifth Circuit also has not indicated that it would be unwilling to adopt the theory in the appropriate case.

To establish a claim under this theory, the Fifth Circuit instructs that a plaintiff must show that "the defendants used their authority to create a dangerous environment for the plaintiff and that the defendants acted with deliberate indifference to the plight of the plaintiff." *Id.* To "establish deliberate indifference, the plaintiff must show the 'environment created by the state actors must be

dangerous; they must know it is dangerous; and . . . they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur.'" *Id.* at 538 (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 585 (5th Cir. 2001)).

Plaintiffs point out that Munoz admitted during his deposition that he was concerned about the safety of the vehicles stopped at the roadblock but that neither he nor Hatcher waved the cars through or allowed them to move out of the way. Dkt. 151 (citing Dkt 151, Ex. H at 81-82). Plaintiffs' expert Ashley states that the alleged failure to train the officers on roadblocks "indicates deliberate indifference to the potential for harmful outcome," and that Munoz and Hatcher knew or should have known "that using spike strips on a high speed, multi-lane highway, at night, on the blind side of an overpass hill where the road curves, with other traffic in the way . . . constituted a forcible seizure that created a substantial risk of causing death or serious bodily injury." Dkt. 115-15 at 14-15. Plaintiffs' expert Quinn opines that the "creation of the roadblock with occupied privately owned vehicles was objectively unreasonable" and the placement "created an extreme degree of risk of serious bodily injury or death to those persons detained by Sergeant Hatcher and Officer Munoz, including the Plaintiffs." Dkt. 115-16 at 4. Quinn further states that Hatcher's and Munoz's "actions in setting up the roadblock and leaving the occupants in their privately owned vehicles were so egregious, so outrageous, that they shock the contemporary conscious." *Id.* As far as HPD's policies, Quinn believes that "the use of occupied privately owned vehicles as part of a roadblock as a stopping technique for a motor vehicle pursuit is deliberate indifference to the driving public in general and the Plaintiffs in particular." *Id.* at 5.

The court finds that this evidence creates an issue of material fact as to whether Defendants created a danger that violated Roques's and Sewell's Fourteenth Amendment substantive due process

9

right to bodily integrity.  Whether the evidence at trial rises to a level sufficient to submit this claim

to the jury, particularly since the Fifth Circuit has not yet adopted the theory, remains to be seen.

The City's motion for summary judgment with regard to this claim is DENIED, but it is DENIED

without prejudice to reassert at trial.

**C.     Roadblock**

Plaintiffs claim that Defendants created a roadblock across I-10, stopping all westbound

traffic and thus restraining Roques's and Sewell's liberty by prohibiting them from passing.

Dkt. 132.  The City argues that there was no "roadblock" in this case because the situation alleged

by Plaintiffs in the complaint does not meet the U.S. Supreme Court's definition of "roadblock" in

*Brower v. County of Inyo*, and HPD used the U.S. Supreme Court's definition in its General Order

relating to motor vehicle pursuits that was in effect at the time ("GO 600-04").  Dkt. 147.  The City

asserts, specifically, that there was no "roadblock" because Lanes 1 and 5 and two emergency lanes

or shoulders were open and unobstructed at the time of Miller's collision with Plaintiffs' vehicle.

*Id.*  Additionally, the City asserts that even if the court were to expand the definition of "roadblock,"

there was no clear law that would have put HPD or its officers on notices that stopping some but not

all lanes of traffic to lay a spike strip constituted a "roadblock."  *Id.*

Plaintiffs assert that the Supreme Court did not establish a legal definition of "roadblock"

in *Inyo*, and *Inyo* does not stand for the proposition that a true roadblock is only one that spans all

lanes of traffic.  Dkt. 151.  Plaintiffs also note that the definition of "roadblock" in HPD GO 600-04

is not the same as the definition used by the *Inyo* court.  *Id.*  Plaintiffs assert that the City's argument

that there was no roadblock because Lanes 1 and 5 and the two emergency lanes or shoulders were

open "defies common sense" because no reasonable person would have felt free to defy the

instructions of the police officer and drive around stopped vehicles and into the emergency lane or the lane where the officer was laying spike strips (Lane 1).  Plaintiffs dispute that the lane the City refers to as Lane 5 was available, asserting that it was an on-ramp that terminated before the crash site.  Dkt. 151 n.44.  Plaintiffs assert that their experts on police protocol explained in detail how and why Munoz's actions stopped Roques's and Sewell's freedom of movement.  Dkt. 151.  Plaintiffs also note that the independent eyewitness stated that Plaintiffs' vehicle came to a stop due to the actions of Munoz.  Dkt. 151 (citing Ex. J).

The court agrees with Plaintiffs that the definition used in *Inyo* is not the same as the definition used in HPD GO 600-04.  In *Inyo*, the U.S. Supreme Court stated that "a roadblock is not just a significant show of authority to induce a voluntary stop, but is designed to produce a stop by physical impact if voluntary compliance does not occur."  *Brower v. Cnty. of Inyo*, 489 U.S. 593, 598, 109 S. Ct. 1378 (1989).  HPD GO 600-04 defines a "standard roadblock" are follows: "Barricades or other obstructions set across a road-way to stop or prevent the escape of a fleeing vehicle."  Dkt. 147-8.  It defines "rolling roadblocks" as follows: "Moving police units placed in front of and behind the fleeing vehicle in an attempt to stop it.  This method may be used only if the suspect is not speeding but is willfully failing to stop."  *Id.*

The court finds that neither definition conclusively excludes the situation created by the officers in this case as a "roadblock."  If one were to rely on the *Inyo* definition, there is at least a question of fact as to whether the officers meant for Miller's car to be stopped by the stopped vehicles if she did not proceed through the lane with the spikes.  As far as the HPD GO 600-04 definition, there is a question of fact as to whether at least the police vehicle and truck were placed

11

across certain lanes to "prevent the escape of a fleeing vehicle," and even if the cars were not across all lanes, as argued by the City, they were still "set across a roadway" to some extent.

Finally, the City's argument that there was no clear law that would have put HPD on notice that actions such as stopping some but not all lanes of traffic constituted a roadblock fails because the situation here meets the common sense definition of a roadblock—no legal definition is necessary. The *road* was, to a significant extent, *blocked*. Whether Roques and Sewell should have felt free to use the shoulders or the other potentially open lane to pass is a question for the jury. The City's motion for summary judgment on the ground that there was no "roadblock" as a matter of law is thus DENIED.

**D.    "Shocks the Conscience"**

Plaintiffs allege that Defendants' conduct of using privately owned and occupied vehicles in a roadblock shocks the conscience. Dkt. 132. The City argues that there is no independent cause of action under the Constitution for a "shocks the conscience" claim. Dkt. 147. The City notes that if, by asserting the shocks the conscience claim, Plaintiffs intended to assert a claim for violation of a substantive due process right under the Fourteenth Amendment, Plaintiffs cannot meet the threshold requirement of demonstrating "'conduct intended to injure in some way unjustifiable by any government action.'" *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1717 (1998)). Additionally, the City asserts that only the most egregious conduct can be considered arbitrary in the Constitutional sense, and the conduct here does not rise to that level. *Id.* The City states that there is no evidence that the actions of the City or officers were intended to injure Plaintiffs or anyone else or that their actions were unjustifiable by any government interest. *Id.* The

12

City points out that neither the U.S. Supreme Court nor the Fifth Circuit has recognized conduct egregious enough to "shock the conscience" in a high-speed chase case. *Id.*

Plaintiffs point out that this is not a high-speed chase case and instead involves the creation of a roadblock. Dkt. 151. Plaintiffs assert that the City has failed to demonstrate there is an absence of material fact with regard to their claim that the City's actions shock the conscience. *Id.*

"[T]he substantive component of the Due Process Clause is violated with executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.' While the measure of what is conscience shocking is no calibrated yard stick, it does . . . 'poin[t] the way.'" *Cnty. of Sacramento v. Lewis*, 523 U.S. at 847 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 128, 112 S. Ct. 1061 (1992) and *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973)). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849. Reckless conduct or gross negligence "may be actionable under the Fourteenth Amendment" in certain circumstances. *Id.* at 849-50. "Rules of due process are not . . . subject to mechanical application in unfamiliar territory. Deliberate indifference that shocks the conscience in one environment may not be so patently egregious in another." *Id.* at 850. The U.S. Supreme Court has held that a shocks-the-conscience claim will not stand in high-speed chases where there is no indication that there was intent to harm the suspect or worsen the suspect's plight. *Id.* at 854.

The court finds that there is an issue of material fact with regard to the shocks-the-conscience claim. While there is no evidence that Defendants *intended* to injure Plaintiffs, there is a question of fact as to whether the officers were reckless or grossly negligent to such an extent that it shocks the conscience. First, it is important to note that this is a roadblock case, not a high-speed-chase

case.  Thus, the U.S. Supreme Court's clear holding that a shocks-the-conscience claim does not lie in high-speed chase cases where no intent to harm is shown is not dispositive.  Second, the evidence at least raises a question of fact as to whether the officers were deliberately indifferent to the safety of the individuals who occupied the parked vehicles.  Plaintiffs' expert Quinn asserts that the behavior in this case shocks the conscience.  *See* Dkt. 115-16.  An eye-witness indicates that Munoz purposefully stopped the car in front of Roques and Sewell's car and that Roques and Sewell's car came to a stop in the same lane prior to being hit by Miller.  Dkt. 151-10 at 21-23.  The experts indicate that the traffic was stopped on the blind side of an overpass at night with Miller approaching at a high rate of speed.  Dkt. 115-16.  Munoz testified that he was concerned for the safety of the people who were in the stopped vehicles, but that he did not gesture for the vehicles to move on. Dkt. 151-8 at 81-82.  A reasonable juror could conclude from this evidence that the officers' behavior shocks the conscience.  Thus, the City's motion for summary judgment is DENIED.

**E.**    **Fourth Amendment Seizure**

Plaintiffs assert that Defendants acted under color of law and with official authority when they erected a roadblock across I-10 and *de facto* seized Roques and Sewell's vehicle and used it as a blockade.  Dkt. 132.  The City asserts that Plaintiffs' Fourth Amendment claim of unreasonable seizure fails because it is undisputed that no HPD officer intentionally acquired physical control of Plaintiffs. Dkt. 147.  The City states that, at best, Plaintiffs allege "an accidental effect . . . of Munoz stopp[ing] the 18-wheeler in lane #3 and the Volkswagen stopping in lane #2," which is insufficient to state a claim under the Fourth Amendment.  *Id.*

Plaintiffs assert that the subjective intent of the officers is irrelevant to whether or not the roadblock constituted a Fourth Amendment seizure.  Dkt. 151.  Plaintiffs argue that a seizure is

14

"simply a governmental termination of the person's movement through means intentionally applied 'even when an unintended person or thing is the object of the detention or taking.'"  Dkt. 151 (quoting *Inyo*, 489 U.S. at 596-97).

In *Inyo*, the U.S. Supreme Court considered whether a Fourth Amendment seizure occurred when a suspect who was being pursued in a high-speed chase crashed into a police-created roadblock that was concealed behind a curve and unilluminated.  *Inyo*, 489 U.S. at 594.  Under the Fourth Amendment, the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. amend. IV.  The Court noted that a violation of the Fourth Amendment occurs when there is "an intentional acquisition of physical control, . . . even when an unintended person or thing is the object of the detention or taking . . . [if] the detention or taking itself [is] willful."  *Inyo*, 489 U.S. at 596.  The Court pointed out, though, that the "Fourth Amendment addresses 'misuse of power,' . . . not the accidental effects of otherwise lawful government conduct."  *Id.* (internal citations omitted).  In other words, a Fourth Amendment seizure occurs only "when there is a governmental termination of freedom of movement *through means intentionally applied*."  *Id.* at 597.  For instance, if a police chase is terminated when the suspect loses control of his vehicle and crashes, there is no seizure, but if the suspect only crashes his vehicle because the pursuing police car pulled beside him and sideswiped him, then there is a termination of the suspect's movement by means intentionally applied and thus a seizure.  *Id.*  In *Inyo*, the Court determined that the very purpose of a roadblock is to induce a stop by physical impact if a voluntary stop does not occur and that it was inappropriate to attempt to gauge whether the officers intended for the suspect to stop on his own rather than

striking the barrier. *Id.* at 598. The Court thus determined that the plaintiff in *Inyo* stated a claim for a Fourth Amendment seizure. *Id.*

While this case is somewhat different than *Inyo* because all lanes were blocked in *Inyo* and it was the actual suspect who police likely intended to stop by the roadblock who was asserting an unlawful seizure, the court finds that there is a question of fact as to whether Roques and Sewell were seized in violation of the Fourth Amendment under the rule stated in *Inyo*. A reasonable jury could determine that Roques and Sewell's movement on the freeway was terminated by means intentionally applied. Thus, the City's motion to dismiss the Fourth Amendment claim is DENIED.

**F.**     **Section 1983 Liability for Failure to Train**

Plaintiffs sue the City and Hurtt for violations of 42 U.S.C. § 1983 through official policies, customs, and practices. Dkt. 132. Specifically, Plaintiffs claim the City and Hurtt failed to supervise and train Hatcher and Munoz on roadblocks and that HPD policies failed to ensure that HPD officers avoid using privately owned and occupied vehicles as part of a stopping technique even though the City and Hurtt were or should have been aware of prior collisions with third-parties due to HPD's motor vehicle pursuit stopping techniques. *Id.* The City argues that judgment should be granted in the City's favor with regards to Plaintiffs' § 1983 claims because Plaintiffs have not alleged and have no evidence of a facially unconstitutional formal city policy. Dkt. 147. Additionally, the City asserts that Buenik and Hurtt conclusively establish that there was no formal policy. *Id.* The City points out that Plaintiffs plead that Munoz and Hatcher violated HPD policy, causing the incident, so any assertions that a policy caused the incident are nonsensical. *Id.* The City additionally argues that Plaintiffs must establish a widespread pattern to establish an informal policy, and they cannot establish a widespread pattern because the City's evidence establishes that from January 1, 2003 to

16

January 14, 2009, which is the date of the incident, there has never been a single incident that was the same or similar to this incident. *Id.* Finally, the City states that even if there were a pattern establishing an informal policy, there is no notice that HPD had actual or constructive knowledge of its existence. *Id.*

The City asserts that, regardless, Plaintiffs fail to allege inadequacies with regard to HPD's training and supervision policies and practices. Dkt. 147. The City argues that, even if Plaintiffs had alleged a deficient HPD policy with regard to training, they fail to establish or provide evidence of any HPD widespread practice or custom of inadequate training, and they cannot base a failure to train claim on a single incident of police misconduct. *Id.* The City argues that Plaintiffs cannot rely on their experts' analysis of a pattern because the experts rely only on the charts HPD provided pursuant to a Freedom of Information Act request rather than on the underlying documentation. *Id.* The City also argues that the officers were adequately trained. *Id.*

Plaintiffs assert that they have presented evidence that the creation of the roadblock constituted deadly force and risk of serious injury from a failure to train that should have been obvious to Hurtt and HPD and that the significant number of collisions with third-parties involving roadblocks prior to this incident should have put Hurtt and HPD on notice of the danger of these types of roadblocks to the public. Dkt. 151. Plaintiffs assert that they have provided ample evidence that there were serious inadequacies in HPD's training program that caused Sewell's and Roques's injuries. *Id.* For example, Plaintiffs' expert Ashley testified about these inadequacies, and both Munoz and Hatcher admitted that they were not trained on how to conduct roadblocks even though the City expressly authorized the use of roadblocks as a motor vehicle pursuit stopping technique. *Id.* Additionally, HPD's Training Division Captain at the time conceded that she was unaware of

any training for cadets at the HPD Police Academy on how to set up a roadblock as a motor vehicle pursuit stopping technique.  *Id.*

"[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."  *Piotrowski*, 237 F.3d at 578.  "The failure to train can amount to a policy if there is a deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional rights on account of novices in law enforcement."  *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 849 (5th Cir. 2009).  "To demonstrate deliberate indifference, a plaintiff must show that 'in light of the duties assigned to specific officers or employees, need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'"  *World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387, 109 S. Ct. 1197 (1989)).  "The failure to train must reflect a 'deliberate' or 'conscious' choice by a municipality."  *Id.* (quoting *City of Canton*, 489 U.S. at 389) (internal quotation marks omitted).  Usually, plaintiffs must demonstrate "at least a patter of *similar incidents*" in order to demonstrate deliberate indifference.  *Estate of Davis ex rel McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) (citations and internal quotations omitted).  These prior indications must "point to the specific violation in question"; the "specificity required should not be exaggerated, [but] the prior acts [must] be fairly similar to what ultimately transpired . . . ."  *Id.*

Buenik, who was the supervisor of the Professional Development Command (now known as the Professional Standards Command), which oversaw training, states in an affidavit that "there

is no [HPD General Order] which directly deals with the multiple factors and rapidly evolving law enforcement setting made the basis of this lawsuit, as HPD attempted to lay a tire deflation device during the pursuit by Harris County." Dkt. 147-6.  He also states that "there was no practice or custom by HPD which caused the subject collision" and that he found "no evidence establishing other HPD incidents which were the same or similar to the subject incident." *Id.*  In fact, he states that he reviewed data that "demonstrates that there was <u>never</u> an incident which was the same or similar to the subject incident" from January 1, 2003 until the date of the incident. *Id.*  Additionally, he states that "HPD adequately and properly trained and supervised its officers, including Officer Munoz and Sgt. Hatcher." *Id.*  Buenik points out that both Munoz and Hatcher testified that they had never had training in how to set up standard roadblocks, but that this is understandable because for "all practical purposes, a standard roadblock is rarely, if ever, an available stopping technique" because it is impractical to set up an obstruction heavy enough to stop a fleeing vehicle yet light enough to move to a location at a moment's notice. *Id.*  Buenik asserts that there was no roadblock in this case as HPD uses the term because the cars were not set up to block all lanes of traffic. *Id.*

Hurtt, who was the Chief of Police for HPD from approximately April 2004 until he resigned in 2009, agreed with Buenik's affidavit. Dkt. 147-9.  He states that while he was Chief of Police, he "was never informed of any indication that Sgt. Hatcher or Officer Munoz needed additional training or supervision, if any." *Id.*  He also states that he "was never informed of HPD incidents which were the same or similar to the subject incident which had occurred and/or which indicated there was a need for additional training or supervision on the law enforcement issues made the basis of this suit, including but not limited to motor vehicle pursuits, restrictions, stopping techniques, GO 600-04, laying of spikes, seizures, and/or use of force." *Id.*

Plaintiffs present evidence that there were potentially inadequacies in HPD's training programs.  For example, HPD's Training Division Captain from mid 2006 through June 2009 testified during her deposition that she was not aware of any training for HPD cadets on how to set up a standard roadblock as a motor vehicle stopping technique, that it "is important to train on pursuits, of which the stopping techniques are part of the training on pursuits," and that she did not recall ever telling anyone to give any instruction on factors to consider in setting up standard roadblocks as a stopping technique.  Dkt. 151-22 at 137-40.  Moreover, Plaintiffs' expert Ashley opines that there were serious deficiencies in HPD's training program with regard to roadblocks, and Munoz and Hatcher both admitted during their depositions that they had never been trained on how to conduct roadblocks.  *See* Dkt. 151-7 (Hatcher Deposition) ("I do not recall any instruction on how to set up a barricade or other obstruction to stop or prevent escape of a vehicle under [General Order 600-04] .  I do not have any idea [how to construct a roadblock under the section] nor do I recall any training with regard to this issue."); Dkt. 151-8 (Munoz Deposition) ("I have never, to the best of my knowledge, been trained on any specific type of roadblock techniques."); Dkt. 151-15 (Ashley Deposition) (opining that Munoz and Hatcher were inadequately trained because they both admitted they had not received training on stationary roadblocks even though it is an authorized technique).

Plaintiffs also present evidence that the inadequacy of training with regard to standard roadblocks should have been obvious to Hurtt, who was the City's policymaker.  Ashley opined that there was a national trend away from using roadblocks in motor vehicle pursuits at the time due to the threat of serious injury and that any reasonable policymaker would have been aware of this trend.  Dkt. 155-11.  Additionally, charts provided by the City on March 19, 2010, which compile data relating to the number of vehicular pursuits within the last two to three years that involved the use

of roadblocks or spike strips, indicate that in 2008 four pursuits ending with a box-in or roadblock caused a collision with a third party, in 2007 five caused a collision with a third party, and in 2006 four caused a collision with a third party.  Dkt. 151-16 (FOIA Charts).  Plaintiffs assert that this data should have put Hurtt on notice that roadblocks and other motor vehicle pursuit stopping techniques could end in serious injury to bystanders.  Dkt. 151.

The court finds that Plaintiffs have presented enough evidence of potential deliberate indifference with regard to training to present the issue to the jury.  The City's motion for summary judgment on this claim is thus DENIED.

**G.     Claims Against Officers in Official Capacity**

Plaintiffs sue Hatcher and Munoz in both their individual and official capacities.  Dkt. 132.  The City argues that claims against Hatcher and Munoz in their official capacities should be dismissed because suits against an individual employee in his or her official capacity are actually suits against the governmental agency when he or she is acting within his or her discretionary or official capacity as an employee of the City.  Dkt. 147.  Thus, the City argues that if Plaintiffs cannot make out a claim against the City, the claims against Munoz and Hatcher in their official capacities must also be dismissed.  *Id.*  Since the court has determined that the claims against the City should not be dismissed at this point, this issue is moot.

**H.     Seizure**

The City asserts that the video of the pursuit and collision taken by the Harris County deputy who was in primary pursuit of Miller irrefutably shows that the vehicle driven by Roques and Sewell was moving and not stopped at the time of Miller's collision with them.  Dkt. 147 (citing Dkt. 147, Ex. E).  The City additionally notes that photographs also establish that the vehicle was not stopped.

*Id.* (citing Dkt. 147, Ex. E).  The City thus asserts that there is no evidence to support Plaintiffs'

claim that their vehicle was stopped or seized by HPD at the time of the collision.  *Id.*

Plaintiffs state that Tony Cleveland, an independent eyewitness, and two of Plaintiffs' experts

testified that it appeared to them that the vehicle was stopped during the crash.  Dkt. 151.  Plaintiffs

further argue that if the vehicle was not stopped, it was coming to a stop due to the show of authority

exercised by Munoz and Hatcher.  *Id.*  Plaintiffs assert that whether the vehicle was stopped, whether

the officers' actions constituted a seizure, and whether the seizure was reasonable are all questions

of fact for the jury.  *Id.*

The court has viewed the evidence submitted by the City and finds that it does not irrefutably

show that the vehicle occupied by Roques and Sewell was moving at the time of the collision.

Moreover, the vehicle did not have to be at a complete standstill to be seized by HPD.  It could have

been "seized" even if it could move forward slightly if the driver was not in a position where he

could freely leave the scene.  There is a question of material fact as to whether the vehicle was

seized.  The City's motion on this ground is DENIED.

## IV. Conclusion

The Plaintiffs' motion to exclude the last paragraph of Slinkard's affidavit (Dkt. 151) is GRANTED IN PART AND DENIED IN PART.   The City's motion for summary judgment (Dkt. 147) is DENIED.

It is so ORDERED.

Signed at Houston, Texas on August 16, 2013.

_____
Gray H. Miller
United States District Judge